<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS**</u>

I, Brian W. Simpkins, Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

<u>**INTRODUCTION**</u>

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Massachusetts State Police ("MSP") Trooper since 2006, and a Sergeant since October 2023.  As a Trooper, I was initially assigned to patrol out of the Framingham, Sturbridge, and Boston Barracks, and then to the Community Action Team in the city of Boston working in a high crime area focusing on gang and drug activity.

2.      Since July 2016, I have been assigned as a Task Force Officer ("TFO") to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including the Drug Enforcement Administration ("DEA"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies. As a DEA TFO, I am an investigative or law enforcement officer of a State, within the meaning of 18 U.S.C. §2510(7), who is empowered by law to conduct investigations for offenses enumerated in 18 U.S.C. §2516, which include violations of federal narcotics laws in violation of Title 21 of the United States Code.

3.      I am a graduate of the Municipal Police Training Committee ("MPTC") Police Academy (9th Municipal Police Officers Class, Weymouth), and the Massachusetts State Police Academy (79th Recruit Training Troop, New Braintree). Prior to becoming a trooper, I was a

Canton Police Officer in a full and part-time capacity from 2001 to 2006. I have a Bachelor of Science degree in Criminal Justice from the Northeastern University. I have attended numerous narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4.      During my time as a police officer and TFO, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular

phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which drug traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone.

**PURPOSE OF AFFIDAVIT**

6.      I submit this affidavit in support of a criminal complaint against Rafael Emilio CRUZ Ciprian, a/k/a "Bellaco" ("CRUZ") and Christopher PEREZ Cruz ("PEREZ"), charging that beginning at least in or about March 25, 2024 and continuing through at least May 29, 2024, did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and distribute 50 grams or more of methamphetamine, a Schedule I controlled substance, in violation of 21 U.S.C. §846 (the "Target Offense").

7.      This affidavit is also being submitted in support of an application for warrants to search the following locations:

> a.   34 Coolidge Street, First Floor, Right-Side Apartment, Lawrence, Massachusetts (hereinafter, "Target Location 1"), which is the residence of CRUZ. Target Location 1 is described herein and in Attachment A, and the evidence to be seized is described more fully in Attachment B.
>
> b.   17 Winter Street, Apartment 17, Dorchester, Massachusetts (hereinafter, "Target Location 2"), which is the residence of Rafael Amauris RIVERA. Target Location

3

2 is described herein and in Attachment A-1, and the evidence to be seized is described more fully in Attachment B-1.

8.    The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause in support of the criminal complaint and probable cause to believe that evidence of the drug trafficking offenses, described more fully in Attachments B and B-1, will be found in Target Locations 1 and 2 (collectively herein, the "Target Locations").   My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. All times herein are approximate.

**Procedural History**

9.    On May 31, 2024, the Honorable M. Page Kelley, United States Magistrate Judge, District of Massachusetts, issued a search warrant authorizing investigators to search 428 Ames Hill Drive in Tewksbury, Massachusetts ("428 Ames Hill Drive"), which is the residence of Jean Carlos SOTOMAYOR [Dkt. No. 24-6398-MPK (under seal)].

**Probable Cause**

10.    In March 2024, DEA was conducting a federal wiretap investigation into a drug trafficking organization ("DTO") led by Jean Carlos SOTOMAYOR Venerio that was believed to be selling fentanyl, cocaine, and methamphetamine and laundering drug proceeds. During the course of this investigation, investigators obtained authorization to intercept two phones used by SOTOMAYOR (specifically, (781) 771-9472 (the "9472 Number") and (617) 835-4811 (the "4811 Number")). Investigators identified CRUZ as a criminal associate of SOTOMAYOR who

was believed to also be distributing controlled substances and laundering drug proceeds. During the investigation, investigators saw SOTOMAYOR and CRUZ traveling together in vehicles. Beginning on March 22, 2024, and continuing through the date of this affidavit, pursuant to federal warrants, investigators were receiving precise location data for a cellular phone assigned call number (978) 869-9247 ("the 9247 Number"), which is used by CRUZ. On May 17, 2024, investigators obtained a warrant to attach a GPS tracking device onto a black Honda CRV, which at the time was registered to Christopher PEREZ Cruz, at 3 Kendall Street, Apt. 211, Boston, Massachusetts (the "Honda CRV"), and used by CRUZ and PEREZ to distribute methamphetamine.

11.    During the course of this investigation, investigators intercepted calls between Rafael Amauris RIVERA and SOTOMAYOR discussing their drug trafficking businesses. RIVERA is believed to be a drug customer of SOTOMAYOR and a close associate. As detailed herein, investigators have seen SOTOMAYOR at RIVERA's residence (Target Location 2) and have seen RIVERA at CRUZ's residence. On April 10, 2024, pursuant to a warrant, investigators began receiving precise location data for (857) 398-3863, which was RIVERA's phone; on April 22, 2024, investigators received authorization to attach a GPS tracking device on RIVERA's vehicle ("the RIVERA Jeep"); and on May 17, 2024, investigators, pursuant to a warrant, began receiving precise location data for (617) 256-1499, a phone subscribed to RIVERA at the address for Target Location 2 and used by RIVERA.

12.    On May 31, 2024, investigators executed a search warrant at 428 Ames Hill Drive pursuant to the federal warrant. Inside the apartment, investigators encountered SOTOMAYOR and Mikarly Elizabeth CABRERA Mejia, who is SOTOMAYOR's paramour and mother of his child. From the master bedroom, investigators recovered over 400 grams of a substance which

field tested positive for fentanyl, which was located between the mattress and box spring. Investigators also recovered a loaded Kel Tec pistol from the bedroom dresser drawer. In the living room area, investigators located inside the fireplace a hydraulic operated hidden compartment, which contained approximately $60,000, over 400 grams of a substance that field tested positive for fentanyl, and a Dominican passport and driver's license that bore SOTOMAYOR's photograph and the name Santiago Marino Reyes Lara. Investigators also seized three cell phones from the living room counter.

13.     After being read his *Miranda* rights in Spanish, SOTOMAYOR agreed to answer questions. SOTOMAYOR admitted that the drugs seized from the bedroom were fentanyl. He admitted that he had been distributing drugs. He admitted that a Target Subject of the investigation known to investigators as "DAVI" was supplying him with drugs. He also claimed that Jorge CASTILLO and RIVERA were drug customers, and that RIVERA was his best drug customer. SOTOMAYOR further claimed that he was expecting a load of 10 to 20 kilograms of drugs the week of June 3, 2024, and that RIVERA was going to receive part of that drug load. SOTOMAYOR agreed to cooperate with investigators to allow them to seize the expected load of drugs. SOTOMAYOR was not arrested.

14.     At the time of the search, SOTOMAYOR was in possession of a phone bearing call number (617) 835-4811 ("the 4811 Number"); investigators were tracking the precise location data for the 4811 Number pursuant to a warrant that was issued prior to the search. SOTOMAYOR had a number of conversations with investigators from the time of the search and up until June 3, 2024, at approximately 2:47 p.m. SOTOMAYOR agreed to meet with investigators at a location in Waltham on June 3, at approximately 3:30 p.m. SOTOMAYOR did not show up for the meeting with investigators and turned off the 4811 Number.

15.     On June 4, 2024, a criminal complaint was filed charging SOTOMAYOR with possession with intent to distribute 400 grams or more of fentanyl. He remains a fugitive at this time.

16.     As detailed below, RIVERA was intercepted over SOTOMAYOR's phones discussing drug business and arranging to meet with SOTOMAYOR. As further detailed below, on four occasions between March 25 and May 29, 2024, CRUZ and PEREZ delivered pounds of methamphetamine to a confidential source in a separate drug trafficking investigation.

<u>March 21, 2024: Investigators saw SOTOMAYOR carrying a weighted bag
into 17 Winter Street, and then intercepted SOTOMAYOR and RIVERA commenting on the
appearance of drugs.</u>

17.     On March 21, 2024, at approximately 12:10 p.m., investigators were conducting surveillance in the area of Target Location 2 (17 Winter Street), where SOTOMAYOR had previously been observed. At 12:13 p.m., SOTOMAYOR arrived at 17 Winter Street in his Jeep (the "SOTOMAYOR Jeep"). At 12:21 p.m., SOTOMAYOR exited the Jeep carrying a weighted blue plastic bag and entered the apartment building within which Target Location 2 is located. At 12:52 p.m., SOTOMAYOR called Jorge CASTILLO's phone ((857) 277-4129). The call was not answered, but prior to disconnecting, RIVERA is heard saying, "Look at how pretty it is." SOTOMAYOR replied, "Yes, that one smells good." SOTOMAYOR again dialed CASTILLO's phone, and again the call was not answered. Prior to disconnecting, RIVERA is heard saying, "Check what that number is." I believe SOTOMAYOR and RIVERA were commenting on the appearance of drugs ("Look at how pretty it is" and "Yes, that one smells good."), and that SOTOMAYOR had delivered drugs to RIVERA in the blue weighted bag observed by investigators. I further believe that when RIVERA said, "Check what that number is," he was asking SOTOMAYOR to check who was calling on a different phone. The number

SOTOMAYOR was calling ((857) 277-4129) is subscribed to "Jorge Castillo." After these attempted calls, SOTOMAYOR was intercepted telling a co-conspirator that he was picking up drug proceeds ("tickets") and that he had met with "Jorge" that same day to pick up "something," which I believe were drug proceeds. I believe SOTOMAYOR was calling CASTILLO to collect a drug debt. As detailed above, SOTOMAYOR admitted that both RIVERA and CASTILLO were two of his drug customers.

18.     At 2:04 p.m. that same day, SOTOMAYOR exited 17 Winter Street empty handed and departed the area in his Jeep. At 2:14 p.m., the SOTOMAYOR Jeep stopped in the area of 267 Fuller Street in Dorchester for approximately three minutes, which is Jorge CASTILLO's residence. I believe SOTOMAYOR went to 267 Fuller Street to pick up drug proceeds from CASTILLO.

<u>RIVERA and SOTOMAYOR discussed drugs that RIVERA was holding for SOTOMAYOR.</u>

19.     On April 9, 2024, at 10:37 a.m., SOTOMAYOR received an incoming call from RIVERA, who was using (857) 398-3863 (the "3863 Number"). SOTOMAYOR asked the quantity of drugs RIVERA had on hand ("How much do you have left of what I gave you?"). RIVERA replied, "Seven and a half." SOTOMAYOR confirmed the quantity ("You have seven and a half left of that one?"), and RIVERA affirmed ("Uh huh."). SOTOMAYOR said he was considering selling those drugs to a customer ("Let me see what I can do. I think I'm going to give it to some people."). RIVERA offered to deliver the drugs if the location was near him ("If it's around here . . . I can go, and you let me know where to drop it off."). SOTOMAYOR replied that the customer was not near RIVERA's location ("No, no, no. It's down this way. It's this way."). RIVERA again offered to deliver the drugs for SOTOMAYOR ("If anything, I'll take it so you

don't have to."). SOTOMAYOR replied he would confirm the sale and get back to RIVERA ("I'll let you know. Let me confirm, and I'll let you know.").

20.     The following day, on April 10, 2024, at 5:21 p.m., RIVERA again called SOTOMAYOR. During a call that lasted over 15 minutes, SOTOMAYOR and RIVERA discussed their drug businesses and collecting drug debts from a customer to whom both SOTOMAYOR and RIVERA supply drugs. RIVERA said he was mad about something ("Buddy, I did not want to call you before because I was mad, man!"). SOTOMAYOR said he understood and asked if RIVERA was with "Loco" ("I know you have your reasons, what you explained to me. You have your reasons, man. Is Loco there?"). SOTOMAYOR said he had tried reaching RIVERA because he was worried about him ("I am worried . . . that is why I said to you yesterday, 'Are you okay buddy?' I hit you up for a couple of days and you did not hit me back."). RIVERA asked if a customer owed SOTOMAYOR a lot of money ("Is it a big or a small number, buddy?"), and SOTOMAYOR replied the person owed him $40,000 ("It is almost at 40 with me, buddy."). RIVERA replied that the man who owed SOTOMAYOR was making a lot of money ("Oh, so he is doing well. He is making tickets, buddy. Because sometimes we more or less know who makes tickets, you understand?"). SOTOMAYOR said the man was good at selling drugs but took too long to pay his drug debts ("And truly, the young guy always works well, but damn! This guy takes too long sometimes."). RIVERA said that he gets mad when people do not pay for drugs that were sold on consignment, but that he and SOTOMAYOR were doing well financially ("Buddy, I am going to tell you something. Sometimes we get mad, right? But like we say sometimes, we are advancing, you understand buddy?"). SOTOMAYOR said he was looking at a "tally" that showed the amount of the drug debt was high ("Now that you are talking about that stuff, I am looking at his tally . . . . He pays, but shit! He went deep."). RIVERA complained that customers

needed to pay more timely because he and SOTOMAYOR had their own debts to pay for the drugs they sell ("I know we all have our responsibilities aside from that."). SOTOMAYOR agreed, and said he and RIVERA pay their debts quickly, and that they cannot use their own money to cover their customer's drug debts ("Buddy, I am just like you. If I owe you 20, I will give it to you. If I complete it with mine, I will end up on the streets. And truly, that is not right. You see?"). SOTOMAYOR said they had to be selective in who they worked with and sold drugs to ("That is why one has to select one's crew. Small, but secure.").  RIVERA complained that he was calling a female to collect a drug debt but she was not answering the phone ("Listen, good thing I hit up the young girl before. Like I told you, I call, they see the call and have to call again after four hours to see if they answer the phone."). SOTOMAYOR said after the customers paid RIVERA, he should not agree to sell to them again immediately ("Yeah, probably does it on purpose . . .  When they pay you, you do the same when they call you so they get back in line."). RIVERA complained that the customer sent $40,000 to pay a different drug debt when he still owed $25,000 to RIVERA ("They have money. How can they tell me they sent 40 pesos over there, when you have a debt of 25 with me?"). SOTOMAYOR said the customer should have given at $15,000 to RIVERA ("They should give you at least 15, take that."). SOTOMAYOR and RIVERA continued to talk about a husband and wife who owed a drug debt to RIVERA.

21.     Later in the call, RIVERA told SOTOMAYOR that he was having problems selling 800 grams of drugs ("My buddy called me this morning . . . they could not do anything with the 800 numbers either. They could not get it out, you already know."). SOTOMAYOR asked which drugs, and RIVERA replied it was a batch of drugs that was poor quality ("It was like 600 something that I told you I had left there and that stuff fell apart . . . The yellow one."). SOTOMAYOR said that RIVERA had a kilogram of drugs ("Man, and you have one there.").

RIVERA said he had already paid SOTOMAYOR for the kilogram ("Buddy, I paid it . . . I paid it to you the last time, I explained to you, 'Buddy, I paid you for it, but I have one left there.' You already know. I am paid because I do not like commitments."). SOTOMAYOR said RIVERA should have given the drugs to him because he could have sold them ("You should have given it to me. I would have gotten it out right away with a buddy of mine."). RIVERA talked about having cocaine that could be cooked into crack cocaine, which he referred to as "cookies" (No, I am going to make it, because don't forget . . . I also had the 400 pesos which I added 100. And the guy told me later on, 'No man, that is to make cookies.'").

22.     RIVERA and SOTOMAYOR continued to talk about drugs people were selling and collecting drug debts quickly. SOTOMAYOR said they needed to demand payment at the time of the sale or within a couple of days ("That has to be with money on hand or a couple of days."). RIVERA admitted that the customer who owed him money had started purchasing a few ounces of cocaine at a time and then began purchasing more without paying for the initial ounces ("In a way since he was small, I got him use to that. Back then he used to take five doves . . . he used to grab five from me. He used to tell me nicely, 'Bring me eight. I'll pay you for five, and I will owe you three. I will pay you those three.' That's how that started increasing and stayed that way, you understand?"). I know that the Spanish word for doves ("Palomas") is commonly used by Dominican cocaine traffickers to refer to ounces of cocaine. SOTOMAYOR replied, "Yes, but you spoiled him because it increased." RIVERA admitted he did not pay attention to collecting his drug debts ("If I would have been like that with the money, I would not be in this position.").

23.     SOTOMAYOR told RIVERA that he learned one of his customers who owed him money for over a year was sidestepping SOTOMAYOR and trying to buy directly from SOTOMAYOR's suppliers and that SOTOMAYOR told the customer he had to pay his prior debt

before SOTOMAYOR would supply him with more drugs  ("Look at the young guy that I had and then I found him contacting my people. You know how I am buddy, I said to myself, 'You are going to pay me my money. You'll see what happens if you don't.' Buddy, he called me one day out of the blue and I said, 'Listen buddy, you and I are friends. But we have something since last year. We keep going back and forth. Let's take care of one tally and then start another one. We have to erase this one.'"). SOTOMAYOR and RIVERA continued to discuss collecting drug debts from their customers before the call ended.

24.     After the call ended, the GPS tracking device on the SOTOMAYOR's Jeep indicated it left the area of SOTOMAYOR's residence, 428 Ames Hill Drive, at approximately 6:40 p.m. Investigators established surveillance in the area of Target Location 2 (17 Winter Street). Investigators followed the GPS location data for the SOTOMAYOR Jeep, which indicated it was in the area of 105 Crawford Street in Boston, which is a one-way street. At 8:15 p.m., investigators located SOTOMAYOR, who was talking to the male driver of the RIVERA Jeep. Based on the intercepted call, investigators believe RIVERA was driving the RIVERA Jeep at that time.

25.     Prior to interceptions beginning over SOTOMAYOR's phone, investigators had observed SOTOMAYOR at 17 Winter Street. For example, on March 28, 2024, at 11:31 a.m., phone records show that SOTOMAYOR's phone called RIVERA's phone. At 11:35 a.m., an investigator observed the SOTOMAYOR Jeep park next to the RIVERA Jeep in front of 17 Winter Street. An investigator observed SOTOMAYOR talking to a male believed to be RIVERA next to both Jeeps. The investigator saw RIVERA open and close the door to the RIVERA Jeep. Shortly thereafter, SOTOMAYOR left in the SOTOMAYOR Jeep.

26.     Investigators have seen the RIVERA Jeep parked outside of 17 Winter Street on numerous occasions, including at times when SOTOMAYOR was seen entering 17 Winter Street. The RIVERA Jeep was most recently seen outside of 17 Winter Street on June 4, 2024.

<u>March 25, 2024: CRUZ and PEREZ delivered a pound of methamphetamine to the CS.</u>

27.     In March 2024, ATF investigators were conducting a separate investigation into a DTO that was selling large quantities of methamphetamine. On March 25, 2024, a confidential source ("CS")[1] negotiated the purchase of one pound of suspected methamphetamine from a target of that investigation. The CS was instructed to go to a residence located at 19 Garden Street in Haverhill, Massachusetts ("19 Garden Street") to conduct the transaction. Prior to the purchase, investigators searched the CS for contraband and found none. Investigators gave the CS $4,000 in official funds to purchase the methamphetamine and equipped the CS with an audio and video recording device. The CS drove to 19 Garden Street in an undercover vehicle ("UC vehicle"), and arrived at 4:55 p.m. At approximately 5:32 p.m., two Hispanic males, later identified as CRUZ and PEREZ, arrived at 19 Garden Street in the Honda CRV and entered the building carrying a bag, which appeared to be a food delivery bag. At 5:38 p.m., CRUZ and PEREZ exited the building and drove off in the Honda CRV. The location data for CRUZ's 9247 Number indicted it was in the vicinity of 19 Garden Street at this same time.

28.     At 5:48 p.m., the CS exited 19 Garden Street along with two targets of the ATF investigation, both of whom are white/non-Hispanic. ATF investigators followed the CS to a pre-

---

[1] The CS has been cooperating with the ATF since 2023. The CS has prior convictions, including convictions for drug offenses, domestic violence, OUI, resisting arrest, and burglary. The CS is cooperating in hopes of charging consideration relating to the straw purchase of a firearm in 2022, for which he has yet to be charged. The CS has also received money compensation for his/her cooperation. Information provided in this investigation and other investigations has been corroborated to the extent possible and has led to one arrest. Information provided by the CS is believed to be reliable.

determined location to debrief the CS. The CS gave investigators a bag, which contained what appeared to be methamphetamine. The CS told investigators that the two Hispanic males who arrived at 19 Garden Street brought the methamphetamine to 19 Garden Street and handed the drugs to the CS.

29.     At 6:14 p.m., the location data for CRUZ's 9247 Number indicated it was in the vicinity of Target Location 1.

30.     The drugs were sent to the DEA Laboratory, which confirmed the drugs were 438.6 grams of pure methamphetamine.[2]

    April 25, 2024: CRUZ delivered a pound of suspected methamphetamine to the CS.

31.     On April 25, 2024, the CS negotiated another purchase of a pound of methamphetamine from a target of the ATF investigation. The CS was again directed to go to 19 Garden Street to make the purchase. Prior to the buy, investigators searched the CS for contraband and found none. Investigators gave the CS $4,000 to buy the methamphetamine and equipped the CS with an audio and video recording device. The CS drove to 19 Garden Street in a UC vehicle, arriving at 5:07 p.m.

32.     At 5:54 p.m., a Hispanic male (later determined to be CRUZ) arrived at 19 Garden Street driving a white Chevy Malibu, which was rented by Esmeralda Perez Ruiz on April 24, 2024 (the "Chevy Malibu").[3] CRUZ entered the building, exited a couple minutes later, and departed in the Chevy Malibu.

_____

[2] This meeting was not recorded because prior to entering 19 Garden Street, the CS removed an outer garment that contained the recording device and left the garment in the UC vehicle.

[3] Esmeralda Perez Ruiz's Massachusetts driver's license lists her residence as 3 Kendall Street, Boston. This is the same address listed on the registration for the Honda CRV that is registered to PEREZ.

33.     At 6:18 p.m., the CS exited 19 Garden Street and drove to a pre-determined location in the UC vehicle where the CS met with investigators. The CS gave investigators a bag, which contained what appeared to be a pound of methamphetamine. The CS told investigators that the Hispanic male had delivered the suspected methamphetamine to 19 Garden Street. The CS stated that the Hispanic male was one of the two individuals who had delivered the methamphetamine on March 25, 2024.  Investigators reviewed the audio and video recording of the transaction and determined that the Hispanic male who arrived in the Chevy Malibu was in fact CRUZ.

34.     Earlier that same day, the location data for CRUZ's 9247 Number and a phone used by SOTOMAYOR indicated they both left the area of SOTOMAYOR's residence (428 Ames Hill Drive in Tewksbury, Massachusetts) at approximately 7:00 a.m. Investigators later determined that SOTOMAYOR and CRUZ traveled to New York in the Chevy Malibu and then returned to Massachusetts. At 4:51 p.m., an investigator saw SOTOMAYOR driving the Chevy Malibu with CRUZ in the passenger seat. At 5:15 p.m., an investigator saw the Chevy Malibu parked outside of 428 Ames Hill Drive. CRUZ entered the building empty handed and returned to the Chevy Malibu approximately seven minutes later carrying a brown bag. CRUZ got back into the Chevy Malibu and drove away. As detailed above, at 5:54 p.m., CRUZ arrived at 19 Garden Street in the Chevy Malibu.

35.     Also on April 25, 2024, investigators were conducting surveillance near Target Location 2 (17 Winter Street). At 2:07 p.m., investigators saw RIVERA's vehicle arrive at 34 Coolidge Street (Target Location 1). As detailed above, CRUZ was in New York with SOTOMAYOR at this time. Investigators saw RIVERA enter CRUZ's residence at 2:08 p.m. RIVERA stayed for a few minutes and then drove back to 17 Winter Street.

May 6, 2024: PEREZ delivered a pound of suspected methamphetamine to the CS.

36.     On May 6, 2024, the CS negotiated to buy another pound of methamphetamine from the ATF target. Prior to the buy, investigators searched the CS for contraband and found none and equipped the CS with an audio and video recording device. At 4:56 p.m., the CS arrived at 19 Garden Street in the UC vehicle and entered the building. At 6:41 p.m., PEREZ arrived at the location in the Honda CRV and entered the building. PEREZ left the building at 6:55 p.m. and drove the Honda CRV back to 34 Coolidge Street.

37.     After the buy, investigators followed the CS to a pre-determined location. The CS gave investigators a bag containing what appeared to be a pound of methamphetamine. The CS reported that the Hispanic male who delivered the methamphetamine was one of the two Hispanic males who had delivered the methamphetamine on March 25. Investigators reviewed the video recording of the buy, and identified PEREZ as the Hispanic male who delivered the methamphetamine. The suspected methamphetamine was sent to the DEA Laboratory for analysis, the results of which are pending.

<u>May 29, 2024: PEREZ delivered a pound of suspected methamphetamine to the CS.</u>

38.     On May 29, 2024, the CS negotiated to buy another pound of methamphetamine from the target of the ATF investigation. Prior to the buy, investigators searched the CS for contraband and found none, and equipped the CS with an audio and video recording device. At 5:02 p.m., the CS arrived at 19 Garden Street in a UC vehicle. At 6:38 p.m., PEREZ arrived at 19 Garden Street driving the Honda CRV.[4]  PEREZ entered the building carrying a brown paper bag and a plastic case. At 6:48 p.m., PEREZ exited the building and drove away in the Honda CRV.

---

[4] On May 28, 2024, the registration for the Honda CRV changed from Christopher Perez Cruz to Jonathan Cruz, at an address in Lawrence, Massachusetts.

39.     After the buy, investigators followed the CS in the UC vehicle to a predetermined location. The CS gave investigators a brown bag which contained what appeared to be a pound of methamphetamine. The CS reported that a Hispanic male delivered the suspected methamphetamine, and that it was the same Hispanic male who had delivered the methamphetamine on May 6 and March 25. Investigators reviewed the video footage from the recording device, which captured PEREZ's face and the suspected methamphetamine. The suspected methamphetamine was sent to the DEA laboratory for analysis, the results of which are pending.

**CRUZ's Residence – Target Location 1**

40.     **34 Coolidge Street, First Floor, Right-Side Apartment, Lawrence, Massachusetts** According to the online real estate company Zillow, 34 Coolidge Street is a four-family residence located on the corner of a residential neighborhood. Target Location 1 is the first floor, right-side apartment, located within 34 Coolidge Street. The exterior of 34 Coolidge Street is covered in beige siding with white trim and is a multi-story residence. There are two main entry doors located in the front of the residence, which are accessed by a concrete stairway and a covered front porch. There are four mailboxes affixed to the exterior next to the door on the right. The number "34" is located above the stairway leading to the front porch. The entry door to Target Location 1 is the door on the right at the top of the outside stairs. A detailed description and photograph of Target Location 1 appear in Attachment A, which is attached hereto and incorporated herein by reference.

41.     Based on physical and electronic surveillance and intercepted calls, I believe CRUZ lives at Target Location 1. The phone location data for CRUZ's 9247 Number indicates it has

consistently been in the vicinity of 34 Coolidge Street most nights and early morning hours, including most recently as June 3, 2024.

42.     In March 2024, CRUZ was intercepted over a Dominican-based number using the 9247 Number to call a target of a Dominican wiretap investigation. During that call, CRUZ discussed collecting money (believed to be drug proceeds) and told the target he would contact him via WhatsApp, and that the WhatsApp number would be different from the 9247 Number. The 9247 Number is listed as the contact number for the internet service ("IP address") at 34 Coolidge Street, Apartment A, in Lawrence (Target Location 1), and the service is subscribed to Jonathan Cruz. As detailed above, the name on the registration for the Honda CRV was changed to Jonathan Cruz on May 28, 2024.

43.     Investigators subpoenaed the IP address information for Target Location 1 because phone number (978) 902-8102 (the "8102 Number") was in frequent contact with three phones used by SOTOMAYOR, all via WhatsApp. WhatsApp pen register data indicated that the 8102 Number connected to the IP address at Target Location 1 while in contact via WhatsApp with one or more of SOTOMAYOR's phones.

44.     Investigators subpoenaed the subscriber information for the 8102 Number and learned that the number did not have active service. However, the 8102 Number continues to be associated with an active WhatsApp account. I also know that CRUZ's 9247 Number does not have a WhatsApp account associated with its number. I know that a WhatsApp account can be associated with a phone number that does not have active service but can still be used when the cellular device is connected to the internet. Based on the intercepted call in which CRUZ stated that he would contact the Dominican target through WhatsApp but that the WhatsApp account would be associated with a different number, and the fact that the 8102 Number connected to the

IP address at Target Location 1, I believe the 8102 Number is the number CRUZ uses exclusively to communicate via WhatsApp, and that he accesses the WhatsApp account using the 9247 Number (*i.e.*, CRUZ's WhatsApp account is downloaded on the 9247 Number).

45.     Investigators have seen CRUZ coming and going from the first floor, right-side door to 34 Coolidge Street on numerous occasions. Most recently, on May 29, 2024, an investigator saw CRUZ exiting and then reentering the front right-side door at approximately 6:05 p.m. and then again at 6:20 p.m.

46.     Also on May 29, at 6:16 p.m., investigators saw PEREZ exit the front right-side door (Target Location 1) and drive away in the Honda CRV. The GPS tracking device on the Honda CRV indicates it proceeded directly to 19 Garden Street, where PEREZ arrived at 6:37 p.m. to deliver a pound of methamphetamine to the CS.

47.     Based on the physical surveillance observations, and the internet subscriber information for Target Location 1, I believe the first floor, right-side door leads directly to Target Location 1.

48.     As detailed in this affidavit, CRUZ and PEREZ have been involved in distributing pound quantities of methamphetamine since March of 2024. As detailed above, PEREZ drove back to 34 Coolidge Street on May 6, 2024, after delivering a pound of methamphetamine; on May 29, 2024, CRUZ and PEREZ were both seen at 34 Coolidge Street prior to PEREZ delivering a pound of methamphetamine to the CS; and PEREZ drove directly from 34 Coolidge Street on May 29, 2024 to deliver a pound of methamphetamine to the CS. Accordingly, I believe that evidence of CRUZ's and PEREZ's ongoing drug trafficking activities, including drugs, drug proceeds, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct

their drug business, and records of wire transfers, as set forth in Attachment B, will be found at Target Location 1.

**Target Location 2 – RIVERA's Residence**

49.     **17 Winter Street, Apartment 17, Dorchester, Massachusetts** is a four-story apartment complex. The building is beige in color. There is a parking lot located in the front of the building. There is at least one main entrance to the building from the small parking lot with two stairways (one in the front and one in the back). Apartment 17 is located on the fourth floor in the stairway most immediate to the parking lot. The door is to the left at the top of the stairway and has the number "17" centered on the middle of the door. A detailed description and photograph of Target Location 2 is detailed in Attachment A-1, which is attached and incorporated herein.

50.     Based on physical and electronic surveillance and intercepted calls, I believe RIVERA lives at Target Location 2. The phone location data for both of RIVERA's phones indicated they were consistently in the vicinity of Target Location 2 most nights and early morning hours, including most recently as June 4, 2024.[5] Moreover, the 1499 Number is subscribed in RIVERA's name at the address for Target Location 2.

51.     Toll records Between April 1, 2024, and May 13, 2024, show that RIVERA's 1499 Number had **580** contacts with SOTOMAYOR's phone ((781)771-9472).

52.     Between April 11, 2024, and May 13, 2024, RIVERA's 1499 Number had **149** contacts with CRUZ's 8102 Number.

53.     The location data for the SOTOMAYOR Jeep indicated it was most recently in the vicinity of 17 Winter Street on May 31, 2024.

---

[5] RIVERA's 3863 Number was deactivated on approximately May 8, 2024. Prior to its deactivation, the location data indicated it was consistently in the vicinity of Target Location 2.

54.     Based on the investigation, including SOTOMAYOR's admission that RIVERA was his best drug customer, the physical and electronic surveillance, and phone records, I believe evidence of RIVERA's drug trafficking activities, including drug proceeds, phones used by RIVERA to conduct his drug trafficking, and records of his drug trafficking activities, as detailed in Attachment B-1, will be found inside of Target Location 2.

DRUG TRAFFICKERS' USE OF RESIDENCES<br>AND CELLULAR TELEPHONES

55.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations – including rented storage units – quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

56.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers and storage units, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is

necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

57.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

58.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences or storage units. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

59.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones

are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

60.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

61.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B and B-1, on their cellular telephones.

62.     Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous

possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

63.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

64.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is

unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

65.    I have participated in the execution of numerous search warrants at the residences of and storage facilities maintained by drug traffickers similar to the targets of this investigation. In a substantial number of residential and storage facility searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

    a.  controlled substances;

    b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, blenders, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

    c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

    d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

## UNLOCKING DEVICES USING BIOMETRIC FEATURES

66.   I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device, and/or content contained on the device, via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

67.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last six days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

68.     The passcodes that would unlock the Target Subjects' devices (hereinafter, the "Target Devices") found during the search of the Target Locations are not currently known to law enforcement.  However, during the course of this investigation, a number of Target Subjects have used Apple iPhones to conduct their drug business.  Thus, it may be useful to press the fingers of the users of the Target Devices found during the search of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device, and/or content within the device, for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by these warrants.

69.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

70.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of CRUZ, PEREZ, and/or RIVERA, or co-conspirators identified in this affidavit to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by these warrants.

71.     The law enforcement agents will endeavor to search and seize only the Target Devices which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachments B and B-1. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## **CONCLUSION**

Based on the information set forth above, I believe probable cause exists to conclude that CRUZ and PEREZ conspired to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §846. I further believe that evidence of the Target Offense will be found inside of Target

Location 1 and on certain cellular telephones seized therefrom. I further believe that evidence of RIVERA's drug trafficking activities will be found inside of Target Location 2 and on certain cellular telephones seized therefrom.

I, Brian W. Simpkins, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

/s/ Brian W. Simpkins
_____
BRIAN W. SIMPKINS
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this ___th day of June 2024.   June 5th, 2024

_____
HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS